IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | CASE NO. 03-32063-WRS |
| COMPANY, INC., | ) | |
| | ) | CHAPTER 7 |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 03-32213-WRS |
| TERRY UNIFORM | ) | |
| COMPANY, LLC, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY, INC. | ) | |
| AND TERRY UNIFORM | ) | |
| COMPANY, LLC, | ) | |
| | ) | CASE NO. 2:07-CV-620-WKW |
| Cross-Appellant/Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELONG, CALDWELL, NOVOTNY, | ) | |
| & BRIDGERS, L.L.C., DELONG | ) | |
| CALDWELL LOGUE & WISEBRAM, | ) | |
| DELONG & CALDWELL, L.L.C. | ) | |
| AND EARNEST H. DELONG, JR., | ) | |
| | ) | |
| Appellants/Cross-Appellees | ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on appeal from the United States Bankruptcy Court for

the Middle District of Alabama in an adversary proceeding brought by J. Lester Alexander,

III, Trustee ("Trustee") of Terry Manufacturing Company, Inc. ("TMC"), against attorney Earnest H. DeLong, Jr. ("DeLong") and his predecessor law firms. The Trustee sought to have DeLong disgorge $476,233.67 in legal fees paid by TMC to DeLong for legal services he rendered in a Georgia civil case litigated prior to TMC's bankruptcy. DeLong appeals the Bankruptcy Court's judgment finding the attorney's fees in full to be avoidable transfers under Georgia law. The Trustee cross-appeals the Bankruptcy Court's finding that only DeLong individually is liable to disgorge the fees. This is a core proceeding over which appellate jurisdiction is exercised pursuant to 28 U.S.C. § 158(a)(1).[1]

## I. FACTUAL BACKGROUND

TMC was an Alabama corporation with facilities in Alabama, Arkansas, and Georgia. For decades, it was in the business of making uniforms and sportswear. Brothers Roy and Rudolph Terry were the company's sole officers, sole directors, and sole voting shareholders. Roy Terry was the president and owned fifty-one percent of the outstanding shares. Rudolph Terry was the company's vice-president and chief financial officer and owned forty-nine percent of the outstanding shares. Rudolph Terry was primarily responsible for the operation of TMC's Atlanta facility.

From outward appearances, TMC was successful and well positioned to compete for lucrative contracts to supply uniforms to large industrial purchasers. Customers included

---

[1] In a related non-core proceeding, the Bankruptcy Court has filed a recommendation with this court finding that DeLong did not commit malpractice in his representation of TMC in the Georgia litigation. *See Alexander v. DeLong, Caldwell, Novotny, & Bridgers, L.L.C.*, No. 2:07-cv-00585-WKW (M.D. Ala).

2

McDonald's and the United States Department of Defense. At some time prior to the 1996 Atlanta Olympic Games, TMC began purchasing T-shirts from Floodgates, Ltd. ("Floodgates"), which was owned and operated by Jon L. Pouncey ("Pouncey").[2] Floodgates began factoring TMC invoices with Commercial Factors of Atlanta, Inc. ("Commercial Factors") prior to the 1996 Olympics.[3]

Several years later, Pouncey and Rudolph Terry entered into a factoring scheme on behalf of their respective companies, Floodgates and TMC. This scheme worked as follows: Floodgates would submit to Commercial Factors invoices indicating that it had shipped T-shirts to TMC, and Commercial Factors would make payments to Floodgates on the invoices. In fact, those T-shirt deliveries did not exist and the invoices were bogus. Rudolph Terry and TMC cooperated in the scheme, and Rudolph later testified that he considered this arrangement a "loan" to Floodgates, admitting that TMC dollars were used to pay invoices for product it never received.

Over eleven million dollars in accounts were factored in this manner, with over ten million dollars paid back to Commercial Factors. In September 1999, Floodgates issued multiple invoices to TMC representing 2.3 million dollars of product. Rudolph Terry had

---

[2] Pouncey was later indicted with Rudolph Terry in the Northern District of Georgia for conduct arising out of these transactions. *See United States v. Pouncey*, No. 1:03-cr-55-CC (N.D. Ga.). Both Pouncey and Rudolph Terry plead guilty.

[3] In this factoring arrangement, Floodgates sold products to TMC on credit, creating an account receivable from TMC in favor of Floodgates. Floodgates discounted the account receivable to Commercial Factors, receiving instant, but discounted, payment. Commercial Factors expected payment of the full account receivable from TMC.

signed a document from Commercial Factors on September 10, 1999, acknowledging delivery of the product, stating that "[t]he above signed acknowledges receipt and acceptance of the goods reflected in the invoices attached. I am aware that Commercial Factors of Atlanta is relying on my verification to advance [funds to] Floodgates Ltd . . . ." (Pl. Trial Ex. # 18.) By the fourth quarter of 1999, TMC was seriously delinquent on its obligation to Commercial Factors. Commercial Factors contacted TMC and Rudolph Terry to demand payment. Having confirmed in writing the validity of the invoices to Commercial Factors, Rudolph Terry caused TMC to make payments on those invoices while he attempted to negotiate a settlement. Commercial Factors was holding TMC invoices reflecting unpaid balances totaling over 3.3 million dollars. TMC, through Rudolph Terry, its vice president and chief financial officer, admitted that it owed approximately 2.1 million dollars for T-shirts Rudolph Terry knew did not exist. Rudolph was negotiating for payment terms, which he expected Pouncey and Floodgates to fund.

Rudolph Terry's attempt to resolve the Commercial Factors' claim in the fourth quarter of 1999 failed. During those negotiations, which were conducted by Rudolph Terry without the assistance of counsel, Commercial Factors filed suit against TMC, Floodgates, and Pouncey in the Superior Court of Gwinnett County, Georgia ("the Georgia litigation").[4] At that point, it was a routine commercial collection case.

When TMC was served with the complaint in the Georgia litigation, the Terry brothers

---

[4] Case number 99-A-10650-5.

4

contacted attorney Jerry Thomas ("Thomas") for litigation assistance. Thomas, in turn, introduced the Terrys to DeLong, who is an Atlanta commercial litigator. DeLong had never heard of the Terrys or TMC before he was engaged to work on the Georgia litigation, and he had no prior business dealings with them whatsoever. In early January 2000, DeLong issued an engagement letter on the letterhead of DeLong & Caldwell, L.L.C., to Rudolph Terry that referenced the Georgia litigation, confirming the following engagement:

> This letter is intended to memorialize the understanding we have reached. Jerry Thomas and I [DeLong] have been engaged to represent the interests of Terry Manufacturing Company, Inc., its officers, directors and shareholders in the defense of the above-referenced matter.

(Pl. Trial Ex. # 10.) DeLong and Thomas continued to represent TMC in the Georgia litigation until TMC's Chapter 11 filing on July 7, 2003, a period of more than forty-two months.

At the time of its initial complaint in December 1999, Commercial Factors was not aware of the factoring fraud scheme. There is no evidence that DeLong or Thomas was aware of the scheme either. On instructions of Rudolph Terry, there was an early attempt by DeLong to settle the case. TMC and DeLong thought the case was settled in August 2000, when in fact it was not, and DeLong attempted but failed to enforce the purported settlement in court. The complexion of the case changed when Rudolph Terry testified during his deposition on October 31, 2000, that he had been advancing and loaning TMC's money to Pouncey and Floodgates, in effect, using TMC's money in the factoring arrangement. Rudolph Terry claimed the dealings with Pouncey and Floodgates were "something [he] did

5

personally. And so it had nothing to do with the company." (Pl. Trial Ex. # 47, 466:15-21.) "[He] was loaning Jon Pouncey Terry Manufacturing Company dollars . . . ." (Pl. Trial Ex. # 47, 486:7-15.) Not surprisingly, in December 2000, the complaint was amended to include Rudolph Terry individually as a defendant with allegations against all defendants for conspiracy to defraud, fraud and deceit, and conversion, claims that Commercial Factors had previously asserted only against TMC, Floodgates, and Pouncey.

On February 20, 2002, Commercial Factors amended its complaint again to assert a claim under Georgia's RICO statute against Floodgates, Pouncey, TMC, and Rudolph Terry. The newly amended complaint specifically alleged theft by deception, theft by conversion, theft by receiving stolen property, "and the use of the United States postal system to perpetuate and continue the fraudulent scheme to obtain money from Plaintiff under false pretenses." (Def. DeLong, Caldwell, Novotny, & Bridgers, L.L.C. Ex. # 6 ¶ 58). The RICO claims sought treble damages and punitive damages. Defenses asserted by DeLong included: (1) TMC was not indebted to Commercial Factors in any amount; (2) TMC was not a party to the creation of the invoices that Floodgates sold to Commercial Factors; (3) TMC did not generally purchase goods from Floodgates after the 1996 Olympics; (4) TMC did not purchase goods as reflected in the invoices at issue in the litigation; (5) the acts alleged against Rudolph Terry, if they occurred, were not acts committed within the scope of Rudolph Terry's employment at TMC; and (6) the acts alleged against Rudolph Terry were *ultra vires* with regard to TMC. Before the Georgia case could be tried, TMC filed for

6

Chapter 11 protection in bankruptcy on July 7, 2003, and Chapter 7 protection in bankruptcy on May 13, 2004. Meanwhile, the Terry brothers pleaded guilty to various federal criminal offenses in Georgia and Alabama and went to prison, and according to counsel, the Georgia litigation was eventually dismissed with Commercial Factors receiving no recovery.[5]

During the course of the Georgia litigation, DeLong billed and was timely paid a total of $476,233.67 as legal fees at a rate of $250 per hour. His undisputed testimony is that he paid one third of the fees to Thomas, who fully participated in the litigation. There is no dispute that the hourly rate of $250 was reasonable, nor did the Bankruptcy Court find that the work claimed to have been done by DeLong was not actually done.

## II. PROCEDURAL BACKGROUND

The Trustee brought suit against DeLong and his predecessor firms seeking to avoid as fraudulent conveyances all the legal fees paid by TMC in the Georgia litigation. The theory of recovery was that those payments constituted fraudulent conveyances under the relevant fraudulent transfer statutes of Alabama and, in the alternative, Georgia, as well as under the bankruptcy code. The Trustee also sought damages arising out of the legal malpractice allegedly committed by DeLong and for breach of the legal duties owed to TMC by DeLong's simultaneous representation of TMC and Rudolph Terry when their interests were in direct conflict. Because the legal malpractice claim was not a core proceeding, the Bankruptcy Court entered proposed findings of fact and conclusions of law, which are

---

[5] Commercial Factors did subsequently file a proof of claim with the Bankruptcy Court.

currently pending before the court as a recommendation in another case, finding no malpractice on DeLong's part. Only the Trustee's fraudulent transfer claims are at issue in this appeal.

The Bankruptcy Court conducted a four and one-half day trial and entered an memorandum decision on May 29, 2007. The court entered judgment in favor of the Trustee and against DeLong individually in the amount of $476,233.67, representing all of the legal fees incurred by TMC in the Georgia litigation. The Bankruptcy Court found that TMC did not receive valuable consideration or reasonably equivalent value in exchange for the attorney's fees that it paid DeLong.

The findings of the Bankruptcy Court rested significantly on what it perceived as a simple defense for TMC to the civil action:

> Terry Manufacturing filed a pleading in court to the effect that it owed $2.1 million, when in fact it had never received the first tee shirt, and for that reason owed nothing. As Terry Manufacturing in fact owed nothing on the invoices, the defense of the civil action should have been a relatively straightforward matter.
>
> . . . .
>
> . . . Terry Manufacturing never received the first tee shirt. This fact could have been easily established with a modest amount of effort. However, this fact could not be proven without also establishing that Rudolph Terry had lied to Commercial Factors about the Floodgates invoices. Thus, the thrust of DeLong's efforts was not to defend Terry Manufacturing in the Commercial Factors civil action. Rather, it was to shield Rudolph Terry from criminal liability, using Terry Manufacturing to fund the effort and refusing to produce Terry Manufacturing documents which would have gotten it off the hook, while placing Rudolph Terry in jeopardy of a criminal indictment.

8

. . . .

. . . Terry Manufacturing did not benefit from DeLong's services in the Commercial Factors litigation. As Terry Manufacturing did not receive the tee shirts represented by the Commercial Factors invoices, it had a simple, straight-forward defense, which DeLong could not raise without also establishing that Rudolph Terry falsely certified the Commercial Factors invoices.

. . . .

. . . Terry Manufacturing did not receive adequate consideration for the cash transfers in suit, and therefore, this Court finds that the transfers are voidable as constructively fraudulent.

*In re Terry Mfg. Co.*, No. 03-32063, 2007 WL 1560087, at *2, *7 & *8-9 (Bankr. M.D. Ala. May 29, 2007).

Having determined that the transfers in issue were avoidable as fraudulent transfers under Georgia law, the Bankruptcy Court found that the transfers were also fraudulent conveyances under 11 U.S.C. § 548, but then stated the court need not reach the § 548 issue because it found the transfers fraudulent under Georgia law. *In re Terry Mfg. Co.*, 2007 WL 1560087, at *9. The Bankruptcy Court also refused to find the attorney's fees voidable preferences within the meaning of 11 U.S.C. § 547(b) because it found the transfers "were made in the ordinary course of business." *Id.* at *11.

### III. ISSUE ON APPEAL

The issue on appeal is whether the Bankruptcy Court abused its discretion in finding that the Trustee met his burden of proving that the transfers from TMC to DeLong for his legal services were constructively fraudulent under Georgia law. Resolution of this issue

9

turns on the narrower question of whether the Bankruptcy Court abused its discretion in finding that TMC did not receive valuable consideration or reasonably equivalent value for any of DeLong's legal services in the Georgia litigation. For the reasons set forth in this memorandum opinion and order, the court finds that the Bankruptcy Court's factual findings are clearly erroneous and that its legal conclusions are *de novo* wrong. The court finds the Bankruptcy Court's premise for deciding the case was faulty as a matter of law, resulting in an analysis of the facts that led to a clearly erroneous finding of fact.

## IV. STANDARD OF REVIEW

A reviewing court reverses a bankruptcy court's decision only if it was an abuse of discretion. *In re Mandalay Shores Coop. Hous. Ass'n*, 21 F.3d 380, 383 (11th Cir. 1994). A court abuses its discretion when it applies an "improper" legal standard or bases its decision on factual findings "that are clearly erroneous." *Id.* Both the federal district and appellate courts reviewing bankruptcy appeals use the "clearly erroneous" and *de novo* standards of review for factual and legal findings respectively. *In re Club Assocs.*, 951 F.2d 1223, 1228 (11th Cir. 1992).

The "clearly erroneous" standard of review for factual findings is "limited and deferential." *Id.*; *see also* Fed. R. Bankr. P. 8013 (stating that for bankruptcy appeals, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"). "[The] deference to the [trial] court is not

Case 04-03135   Doc 238   Filed 09/30/08   Entered 09/30/08 15:36:29   Desc Main
Document   Page 10 of 33

*un*limited, however, and [reviewing courts] will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it." *Lincoln v. Bd. of Regents*, 697 F.2d 928, 939 (11th Cir. 1983) (emphasis added). A finding is clearly erroneous if the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The district court's review of a bankruptcy court's legal conclusions, on the other hand, is *de novo*, *In re Club Assocs.*, 951 F.2d at 1228; the court must "independently examine the law and draw its own conclusions after applying the law to the facts," *In re Norris*, 239 B.R. 247, 249 (M.D. Ala. 1999) (internal quotation marks omitted).

## V. DISCUSSION

DeLong is appealing the Bankruptcy Court's finding that TMC's payments for legal services he rendered during the Commercial Factors litigation were fraudulent conveyances under § 18-2-22(3) (repealed 2002) of the Georgia Code for payments made prior to its repeal, and § 18-2-74(a)(2) of the Georgia Code for payments made after the repeal.[6] (Appellant Br. 12 (Doc. # 13).) Under both the former and current fraudulent conveyance statutes, payments are considered fraudulent if they were made by a debtor with insufficient assets in exchange for insufficient value as defined by each statute respectively, and the burden is on the plaintiff, here the Trustee, to make this showing. Central to this appeal,

---

[6] DeLong has also appealed the Bankruptcy Court's finding that he was not acting as a conduit for the payments TMC made to Thomas (Appellant Br. 13), and as already noted, TMC cross-appealed the Bankruptcy Court's finding that no other defendants were liable (Cross-Appellant Br. 3 (Doc. # 21)). Because the court finds DeLong is not liable, the court need not, and declines to, decide those issues.

11

therefore, is the Bankruptcy Court's determination that TMC received insufficient value for DeLong's legal services. The court holds that the Bankruptcy Court's finding that TMC received insufficient value for DeLong's legal services was an abuse of discretion, and that TMC's payments were not fraudulent conveyances under Georgia law.

*The Former and Current Georgia Statutes on Fraudulent Conveyances*

TMC's payments to DeLong prior to July 1, 2002, fall under Georgia's repealed statute on fraudulent conveyances, § 18-2-22, which defines three types of fraudulent transfers.[7] The third type of fraudulent transfer is relevant here and is defined as a "voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance." § 18-2-22(3). A plaintiff must prove the indebtedness, the debtor's insolvency, and that the conveyance was voluntary; when those facts are proven, "the law conclusively presumes a fraudulent intent and declares the instrument void" with respect to creditors that had demands at the time of the conveyance. *Chambers v. Citizens & S. Nat'l Bank*, 249 S.E.2d 214, 217 (Ga. 1978) (describing elements); *Stokes v. McRae*, 278 S.E.2d 393, 395 (Ga. 1981) (establishing burden of proof).

"[A] voluntary conveyance . . . is one without any valuable consideration," which the Georgia Supreme Court has defined as a conveyance not "founded on money, or something convertible into money, or having a value in money." *Stokes v. McRae*, 278 S.E.2d at 395

---

[7] *See Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1081 (11th Cir. 2004) ("[W]e do not agree with the district court that the repeal [of this statute] extinguished causes of action that had arisen under the repealed section but had not yet made it to final judgment.").

(citations omitted). The performance of services can qualify as consideration. *Lionheart Legend, Inc.* v. *Norwest Bank Minn. Nat'l Ass'n*, 560 S.E.2d 120, 124 (Ga. App. 2002) (citing *Avary v. Avary*, 41 S.E.2d 314, 322-23 (Ga. 1947)). Whether a conveyance is voluntary "depends upon the intention of the parties," *Pharr v. Pharr*, 57 S.E.2d 177, 180 (Ga. 1950), but intention goes to whether the conveyance was for valuable consideration, and not to whether the purpose of the transfer was to defraud creditors; in other words, proof of *fraudulent* intent is not required, *Mercantile Nat'l Bank v. Aldridge*, 210 S.E.2d 791, 793 (Ga. 1974).

A conveyance for valuable consideration on its face is valid unless rebutted by sufficient evidence that the conveyance was without any valuable consideration. *Pharr*, 57 S.E.2d at 180. Georgia courts have found that if the consideration involves *any* money or has *any* value in money, the transfer is facially valid. In *Pharr*, a deed was voluntary because the claimants had not offered enough evidence to sufficiently rebut a facially valid transfer for a consideration of $5 and love and affection. *Id.* (citing *Lifsey v. Mims*, 20 S.E.2d 32, 33 (Ga. 1942), a case finding $1 and love and affection a voluntary conveyance on its face)). Indeed, in a case before the Southern District of Georgia, the court stated that if a transferee "received any money, even a dollar, the conveyances would not be facially invalid." *United States v. Reid*, 127 F. Supp. 2d 1361, 1369 (S.D. Ga. 2000) (noting that an example of a facially invalid conveyance is one only for love and affection); *see also In re Holmes*, 296 B.R. 567, 573 (Bankr. M.D. Ga. 2003) (that a party paid a high price for land does not mean

that the party did not receive "something of value"); *Stokes*, 278 S.E.2d at 395 (affirming a directed verdict for finding no fraudulent deed when at least part of the consideration was for money or the value of money); *McDonald v. Taylor*, 37 S.E.2d 336, 338 (Ga. 1946) ("A voluntary conveyance is a conveyance without *any* valuable consideration." (emphasis added)). With respect to the sufficiency of evidence to overcome a presumption of validity, if a party opposing liability fails to show additional consideration, that absence does not itself eliminate the presumption that the consideration was valuable. *See Pharr*, 57 S.E.2d at 358. And if the evidence offered by a party burdened with overcoming the presumption attempts only to show that the value of the property was higher than the monetary consideration exchanged between the parties, that showing is not enough to overcome the presumption of voluntariness. *See id.* at 357-58. Thus, under Georgia's former fraudulent transfer law, a transfer for some value is not fraudulent unless the prosecuting party proves that the parties did not intend valuable consideration.

Effective July 1, 2002, Georgia repealed § 18-2-22, and adopted the Uniform Fraudulent Transfer Act ("UFTA"), *see* § 18-2-70, and codified the new fraudulent transfer law as § 18-2-74. Under the new law, a transfer is fraudulent if the debtor "made the transfer or incurred the obligation . . . (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation" regardless of when the creditors' claims arose, but with certain conditions with respect to the debtor's near insolvency or intention to be

14

insolvent.[8] § 18-2-74(a)(2).[9]  That a bona fide creditor existed at the time of the transfer and that the debtor's insolvency requirements are met are undisputed in this case.  *In re Terry Mfg. Co.*, 2007 WL 1560087, at *7.  The disputed element is whether the legal services were of "reasonably equivalent value" to TMC's payments.

No court has interpreted the language "[w]ithout receiving a reasonably equivalent value," § 18-2-74(a)(2), as it appears in this Georgia statute.[10]  Courts in other jurisdictions, however, have interpreted the UFTA's language.  Courts have also held that the UFTA's "reasonably equivalent value" language was derived from the Bankruptcy Code's similar provision 11 U.S.C. § 548(a)(1)(B)(I),[11] and have appropriated glosses on § 548 for

---

[8] In one sense, "intention" remains a part of the analysis.  If the transfer was without "reasonably equivalent value," and the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were 'unreasonably small' . . . . [or] *intended* to incur, or believed or reasonably should have believed that he or should would incur, debts beyond his or her ability to pay as they became due," the transfer was fraudulent.  § 18-2-74(a)(2) (emphasis added).  The "intention," however, describes the debtor's scienter with respect to the status of insolvency and not to the value of the transfer.  Additionally informative of the role of intention under the current law is § 18-2-78 of the Georgia Code, which provides for a good faith defense (requiring good faith and the exchange of reasonably equivalent value) but only for defendants subject to § 18-2-74(a)(1) – the provision for transfers that are *actually* fraudulent, *see infra* note 9 (describing § 18-2-74(a)(1)).   If a transferee acted in good faith but the value was not reasonably equivalent, the transferee is protected to the extent of value that was given by a reduction in the *amount* of liability at judgment, but that determination is irrespective of the voidability of the transfer.  § 18-2-78(d)(3).

[9] A transfer also can be fraudulent because the debtor "made the transfer or incurred the obligation (1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  Ga. Code Ann. § 18-2-74(a)(1).

[10] Georgia law does define "reasonably equivalent value" with respect to receiving an interest in the debtor's asset through sales, Ga. Code Ann. § 18-2-73(b), but that provision does not cover the circumstances in this case.

[11] Section 548 states, in relevant part, that a "Trustee may avoid any transfer . . . if the debtor voluntarily or involuntarily . . . (B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation."

15

interpretations of the UFTA. *See, e.g.*, *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 630-31 (3d Cir. 2007) (using the same definition of "reasonably equivalent value" as used under § 548 for interpreting the UFTA provision when there was no state law on the language); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998) (stating that "the UFTA is a uniform act, and it derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2)" and for that reason, looking to interpretations of § 548 when state law provided no interpretation of the UFTA in the context of transfers that benefitted third parties). The Fifth Circuit has recently stated that "[t]he primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." *Secs. Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (internal quotation marks omitted) (noting additionally that commentary from the UFTA states that "value is to be determined in light of the act's purpose, in order to protect the creditors." (internal quotation marks omitted)). In *Resource Development International*, the court found no reasonably equivalent value when the debtor transferred money to fund the legal defense of a "major organizer" of the fraud scheme, citing case law that payments made *solely* for third-party benefits are not for reasonably equivalent value. *Id.* The Third Circuit has applied a "common sense" approach – that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the same value it gave,'" *VFB LLC*, 482 F.3d at 631 (citation omitted). *See also Creditor's Comm. of Jumer's Castle Lodge v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007) ("determin[ing] the value of what was transferred and [] compar[ing] it to

16

what was received") (internal quotation marks omitted). And the Ninth Circuit has made the point that "reasonably equivalent value" is determined from the perspective of the debtor and not the giver. *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807 (B.A.P. 9th Cir. 1995).

Assuming that § 548 does shed light on the meaning of "reasonably equivalent value," the court turns to the Eleventh Circuit's interpretation of "reasonably equivalent value" under § 548. The Eleventh Circuit has incorporated into its interpretation of § 548 case law interpreting the phrase "fair consideration" from an earlier version of the Bankruptcy Code. *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 n.11 (11th Cir. 1990). "Fair consideration" requires "(1) a fair equivalent, and (2) good faith on the part of the transferee." *In re S. Land Title Corp.*, 474 F.2d 1033, 1036 (5th Cir. 1973).[12] Thus, under § 548, a trustee can avoid transfers that were not "fair equivalents" and were not received in good faith by the transferee.

The UFTA's language, however, is slightly different, in that under the UFTA, good faith alone will not prevent a transfer from being constructively fraudulent. A good faith transferee is instead protected up to the amount of value it transferred, notwithstanding the fact that the amount of value was not of "reasonably equivalent value."[13] A "good faith"

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

[13] Section 18-2-78(d) states specifically:

> Notwithstanding voidability of a transfer or an obligation under this article, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:

Case 04-03135    Doc 238    Filed 09/30/08    Entered 09/30/08 15:36:29    Desc Main
Document      Page 17 of 33

defense, on the other hand, requires both good faith *and* reasonably equivalent value to render a transfer not voidable, and thus applies only to actual fraud cases. *See* § 18-2-78. Therefore, a transfer is voidable under the *constructive* fraudulent provision under Georgia law regardless of whether the transferee has good faith, but good faith will afford the transferee protection on the amount that was given in transfer. That procedural step of determining voidability before the transferee's judgment matters in this way: The part of the definition from "fair consideration" that requires "good faith" can enter the analysis of "reasonably equivalent value" under the UFTA only *after* a transfer is considered fraudulent. *See United States v. Estate of Kime*, 950 F. Supp. 950, 955 n.6 (D. Neb. 1996) (noting that the "[n]otwithstanding voidability" language "is not a defense to a judgment" but only diminishes the judgment); *In re Brun*, 360 B.R. 669, 673 (Bankr. C.D. Cal. 2007) (describing fraud and a good faith inquiry, in summarizing another case, as a two-step process of determining a fraudulent transfer and determining an amount in liability). This distinction will factor into the court's analysis of the facts.

In *In re Rodriguez*, 895 F.2d 725 (11th Cir. 1990), the Eleventh Circuit defined § 548 on constructively fraudulent transfers slightly differently as a provision that does "not authorize voiding a transfer 'which confers an economic benefit upon the debtor,' either directly or indirectly." *Id*. at 727 (quoting the Second Circuit). The court linked its

_____

(1) A lien on or a right to retain any interest in the asset transferred;
(2) Enforcement of any obligation incurred; or
(3) A reduction in the amount of the liability on the judgment.

18

construction of § 548 to the statute's specific purpose, which is to protect creditors. *Id.* The UFTA's purpose mirrors that of § 548, *see supra* p. 16. And in a later, more recent case, *In re Friedman's Inc.*, No. 407CV041, 2008 WL 1758815 (S.D. Ga. Apr. 16, 2008), the district court defined "reasonably equivalent value" as receiving "'roughly the value that [a party] gave.'" *Id.* at *2 (quoting Bankr. Service L.Ed. § 34:260 (Feb. 2008)). These alternative interpretations of § 548 – "an economic benefit" and "roughly the value" – are not as stringent for the party facing liability as the "fair equivalent" definition; an economic benefit can be less than a fair equivalent, as can a rough approximate of the value. Thus, if the court finds a "reasonably equivalent value" under the "fair equivalent" definition, the court necessarily finds it under those others.

The consideration at issue under both the former and current laws is DeLong's legal services. Other courts have addressed the value of legal services in just this context though none of the cases is directly on point or binding. One case that is illuminating, however, is *In re Armstrong*, 234 B.R. 899 (Bankr. E.D. Ark. 1999), where the court examined whether payments to criminal defense attorneys were constructively fraudulent transfers under § 548. "In determining reasonably equivalent value," the court stated, "the [c]ourt looks not only to the hours performed by the attorney, but to the contract as a whole." *Id.* at 904 (referring to a retainer). The court emphasized that a determination of reasonably equivalent value must be based on the value of the transfer *at that time*; "subsequent appreciation or depreciation in the value does not transform [a transfer] with reasonably equivalent value into

19

a fraudulent transfer." *Id.* at 905. In determining whether the fee was reasonable, albeit a retainer fee, the court considered "the subjective factors of securing a particular attorney, that attorney's time, the importance and/or prominence enjoyed by the attorney, the importance and/or notoriety of the client, and the mere fact that the client's freedom may be at stake [in that criminal case]." *Id.* "[T]he fact that neither [the attorney] nor the trustee [could] add up [the attorney's] hours to equal [the amount paid in the retainer] [did] not alone negate reasonably equivalent value." *Id.* The court refused to conclude that the attorney's work did not contribute to the case's outcome. *Id.* The court was clearly deferential to the subjective factors that shape the character of the particular legal representation.

*Standard of Review for the Fraudulent Transfer Claims*

The questions of valuable consideration and reasonably equivalent value are largely questions of fact. *In re Chase & Sanborn Corp.*, 904 F.2d at 593 ("It has long been established that '[w]hether fair consideration has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'" (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829-30 (5th Cir. 1959)) (applying the standard of review to findings of "reasonably equivalent value" under § 548). The Bankruptcy Court's findings must be "clearly erroneous." *In re Bardwell*, 610 F.2d 228, 230 (5th Cir. 1980).

In this case, the court reverses the Bankruptcy Court's findings on whether valuable consideration or legal services of reasonably equivalent value were exchanged between TMC

20

and DeLong. The review of the Bankruptcy Court's findings of fact is more complicated than merely a review of the record because the findings of facts were framed by what this court finds were erroneous assumptions of law. More precisely, the Bankruptcy Court's findings of fact relied on its interpretation of TMC's legal exposure at various points in the litigation – an interpretation based on incorrect assumptions of law. The Bankruptcy Court's critical finding was that the "thrust of DeLong's efforts was not to defend [TMC] in the Commercial Factors civil action [but] [r]ather, . . . to shield Rudolph Terry from criminal liability," 2007 WL 1560087, at *7, and the basis for that claim was that TMC had "a simple, straight-forward defense" – that TMC never received any T-shirts – a defense "DeLong could not [have] raise[d] without establishing that Rudolph Terry falsely certified the Commercial Factors invoices," *id.* at *8. To assert TMC's defense was mutually exclusive of Rudolph Terry's is not so much an over-simplification but rather a failure to apprehend the legal liability hovering over TMC before DeLong ever commenced the representation. That misapprehension shaped how the Bankruptcy Court determined the value of DeLong's legal services to TMC.

*TMC's Legal Exposure During the Georgia Litigation*

What matters for determining the value of DeLong's legal services is not TMC's actual liability but its *potential* liability. An *ex ante* perspective of TMC's potential and developing liability during the Georgia litigation must shape the analysis. TMC's legal exposure during the Commercial Factors litigation was considerable even prior to DeLong's representation.

When Commercial Factors pressed TMC to pay the bogus invoices, TMC through Rudolph Terry confirmed the invoices and caused TMC to make payments on them. *See supra* pp. 3-4. When DeLong began the representation, the facts before him included invoices with TMC's approval, payments on the invoices, and the representation of the Terry brothers implicating corporate liability. For DeLong to conclude that TMC had no liability based on those facts would have been imprudent. Even if, assuming *arguendo*, DeLong were aware of the fraudulent scheme (and there is no evidence or allegation that he was), TMC's defense was not a simple contract argument. The determination of whether Rudolph Terry's actions were unauthorized and not imputed to the principal, TMC, involved a hairy question of law dependent on as yet undiscovered facts. DeLong's explanation of this predicament in his trial testimony is illustrative. When asked why he waited until 2003 to assert a defense on behalf of TMC that Rudolph Terry's actions were outside the scope of employment, DeLong answered that asserting the defense earlier would have been "a very bad idea," and he added:

> You don't file summary judgments or motions for summary judgment until discovery has been completed. The facts that had come out, the evidence that Commercial Factors had presented, just the bare fact that there were invoices that Commercial Factors had purchased that were Terry Manufacturing Company invoices, that were signed by Rudolph Terry, meant that there were an awful lot of things going against the company. *And I had to develop a basis* to go to the court and say to the court, look, this is very likely a situation where Terry Manufacturing has no involvement.
>
> And so what I had to do is develop the theory very carefully and, when it was too late for Commercial Factors to come back and do the things that it might otherwise do to get around it was the right time to file the motion.

(Trial Tr. vol. 1, 196:9-25 (emphasis added).) DeLong needed a basis for presenting a case for why TMC was not liable on theories of outright fraud and ratification.

TMC would have been liable for fraud if TMC had been complicit in the scheme all along, as the acknowledged invoices could have initially suggested. Whether TMC was, at any point, liable on a ratification theory is not necessary for this court to decide. The relevant question is instead whether TMC *could* have faced liability based on a ratification theory and what issues remained for DeLong to reach that determination. At the very least, the question is whether TMC's legal exposure extended beyond that which would exist under a mere contract claim.

Under Georgia law, a corporation can be liable under the agency principle of ratification. *See, e.g.*, *Potts-Thompson Liquor Co. v. Potts*, 69 S.E. 734 (Ga. 1910); *Ely & Walker v. Dux-Mixture Hardware Co.*, 582 F. Supp. 285, 292 (N.D. Ga. 1982). "[R]atification is the confirmation by one of an act performed by another without authority." *Griggs v. Dodson*, 154 S.E.2d 252, 256 (Ga. 1967). Under Georgia's statute on ratification, the ratification will relate back to the ratified act. Ga. Code Ann. § 10-6-52. Ratification also requires knowledge on the part of the ratifying principal of the material facts of the agent's actions. *Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 683 (11th Cir. 1990). That TMC acknowledged the invoices for the T-shirts at least raised the possibility of liability because TMC arguably ratified the financial arrangement by that acknowledgment. Furthermore, if TMC was on notice of the fraud, by reason of the fact that

it certified invoices for merchandise it never received, liability for Rudolph Terry's tort would have also factored into TMC's legal exposure. Ga. Code Ann. § 51-1-12 ("By ratification of a tort committed for his own benefit, the ratifier becomes as liable as if he had commanded that it be committed."); *Hobbs v. Principal Fin. Group*, 497 S.E.2d 243, 244 (Ga. App. 1998) ("Generally, an employer may be held responsible for the tortious act of an employee where the act was . . . ratified (by the employer) after its commission . . . ."). (*See* Appellant Br. 19 ("TMC knew when it acknowledged the invoices, when it paid on the invoices, and when it attempted to settle [Commercial Factors'] claim that it had received no tee shirts[,] [and] [u]nder Georgia law this was strong evidence that TMC had ratified Rudolph Terry's conduct.").) For liability to attach to the principal, the tort must have been committed for the ratifier's benefit. § 51-1-12; *e.g.*, *Travis Pruitt & Assocs., P.C. v. Hooper*, 625 S.E.2d 445, 449 (Ga. App. 2005). But at the time DeLong was handling the case, it was not clear whether Rudolph Terry participated in the Floodgates scheme in order for it to inure to the benefit of TMC, for Rudolph Terry's sole benefit, or for the benefit of both.

The determination of liability by ratification was thus wrapped up with a series of fact-bound legal determinations, including if, how, and when the principal "ratified" the officer's actions, whether and when the principal had knowledge of the material facts, the legal and practical effect of the fact that the ratifying officer was one of the only two officers and directors of the principal and that they were brothers, and other details relevant to whether the ratification would prevent TMC from arguing that it owed no money. To distill

24

TMC's position at the beginning of the litigation to that of an innocent contract party – and to fault DeLong with not recognizing that – fails to take into account the fact that TMC appeared to have confirmed the invoices, DeLong was outside counsel and unfamiliar with the company, the officers were also the sole shareholders and directors, and the potential monetary damage from TMC's apparent liability was significant.

Even aside from the question of ratification, DeLong had undertaken a collection case, and his task included sifting through invoices to ensure the amount of money owed. It seems naive to assume that DeLong should have initially suspected massive fraud as the primary reason for why the invoices were unpaid. Furthermore, the unraveling of fraud requires time and carefully considered investigative work to discover the truth while preserving the viability and reputation of the company. It also seems naive to assume that TMC would have had success in asserting from the beginning a defense that it owed nothing. Commercial Factors was interested in retrieving the alleged millions of dollars it lost and TMC by all appearances had the money to pay that back. Absent from the Bankruptcy Court's analysis is an appreciation for Commercial Factors' pragmatic interest – to get paid.

As the litigation progressed, TMC faced liability counts on conspiracy, fraud, conversion, and RICO. TMC's liability remained tied to Rudolph Terry's unless and until TMC could *prove* that it was disconnected from the fraud, or that Rudolph Terry acted outside the scope of employment and that TMC's acknowledgments were not a ratification of Terry's actions. A recitation of the entire record – and all of the steps DeLong took to

protect TMC in litigation – is not necessary. The burden of proof is on the Trustee, *Stokes*, 278 S.E.2d at 395, and as explained below, the Trustee has failed to show that DeLong's legal services were not for valuable consideration or reasonably equivalent value.

*Value of DeLong's Legal Services*

Because the Bankruptcy Court inaccurately assessed TMC's legal exposure during the Commercial Factors litigation, the finding derived from that error – that TMC received no benefit from the defense – was clearly erroneous. The Bankruptcy Court approached the evaluation of DeLong's legal services from the standpoint that TMC's clear defense was to argue TMC owed nothing. If TMC could have successfully weathered the Commercial Factors litigation with that defense, DeLong's legal strategy would have been, at the very least, perplexing. The court's understanding of TMC's legal predicament, however, yields a different finding of fact. Because TMC's legal exposure was complex, serious, unclear, and unsettled during DeLong's representation, particularly at the beginning, the court finds the Bankruptcy Court abused its discretion in finding the legal services were of insufficient value to TMC.

Under the former Georgia law, TMC received "valuable consideration." The transfer was clearly facially valid. TMC received at least *some* value in the form of legal services from DeLong. For one, DeLong filed an Answer when Commercial Factors sued TMC; that protected TMC from a default judgment. The pleadings DeLong filed for TMC asserted a number of arguments that comported with a plausible understanding of the facts. DeLong

26

also attempted, on instructions from his client, to settle the case for TMC. The argument that TMC derived no benefit from these negotiations underestimates the realities of litigation. Even if TMC was innocent, TMC had little choice at that stage in the litigation. Through its officer, TMC had acknowledged prior to DeLong's representation that it owed Commercial Factors money. TMC could fight or settle the claims. The sun does not stand still when a company faces a strategic decision of this nature. Settlement is not synonymous with liability – a company can have perfectly rational and valuable reasons to settle a case in the face of uncertain liability.

The Bankruptcy Court adjudged DeLong's legal fees "astonishing," 2007 WL 1560087, at *7, but a finding that the transfer should have been valued lower does not rebut a facially valid transfer under prior Georgia law, *see supra* p. 13. The Trustee failed to rebut the facially valid transfer with sufficient evidence. Perhaps from the starting point of the Bankruptcy Court's understanding of TMC's legal predicament, TMC's payments could have circumstantially suggested that the parties intended not to benefit TMC but to benefit Rudolph Terry. Starting from this court's position that TMC faced real liability, however, DeLong protected TMC from potential and eventual claims of fraud, which benefitted TMC. Given TMC's potential liability, the nature of the payments no longer supports a conclusion implicit in the Bankruptcy Court's findings that TMC intended to receive less than valuable consideration.

Case 04-03135    Doc 238    Filed 09/30/08    Entered 09/30/08 15:36:29    Desc Main
Document      Page 27 of 33

There is also insufficient direct evidence of DeLong's intent to render insufficient legal services to TMC, or that TMC's payments were intended to benefit Rudolph Terry *instead of* TMC. Neither is the consideration insufficient because Rudolph Terry benefitted from the TMC-paid representation in his individual capacity. In fact, because the question of fraud for both defendants remained interrelated until DeLong could sift the facts and formulate a strategy, any benefit to Rudolph Terry was an indirect benefit to TMC until TMC's liability could be analytically severed from Rudolph Terry's.[14] Only under the Bankruptcy Court's assumption that TMC had one simple defense do the legal services DeLong rendered to TMC fail to confer valuable consideration to TMC.

Under the current Georgia law, the legal services were also of reasonably equivalent value to TMC's payments. Only the payments after July 1, 2002, fall under this standard. The Bankruptcy Court's rationale for finding the legal services were not reasonably equivalent under the current law depended entirely on its findings of fact under the former Georgia law. 2007 WL 1560087, at *9. The Bankruptcy Court did not attempt to analyze the payments after 2002 to determine if, beginning at that point, the legal services were of reasonably equivalent value. In all likelihood, the Bankruptcy Court would have detailed

---

[14] A case from the Southern District of Florida touches upon this point. The court found reasonably equivalent value in legal services provided by an attorney even though the attorney's representation was for parties in a litigation matter involving the debtor but not for the debtor. *In re Trauger*, 105 B.R. 120 (Bankr. S.D. Fla. 1989). Counsel was engaged and paid by the debtor, *id.* at 121-22, 123, and represented two employees, their spouses, and two companies in a litigation matter involving the debtor, these, and other parties, *id*. at 122. The court decided, given the conflicting evidence, that the debtor's decision to engage and pay for counsel for others "was not a gratuitous selfless act of generosity." *Id.* at 123. Based on the record in that case, the court concluded that "a benefit to these litigants represented a benefit to the debtor's position in that trial." *Id.*

28

how the payments were not reasonably equivalent based on its position that from the beginning, TMC's defense should have pursued an entirely separate trajectory from Rudolph Terry's. This court, again, has based its findings of fact on a different assumption about TMC's legal exposure, and for that reason, the Bankruptcy Court's finding of fact on whether DeLong's legal services were "reasonably equivalent" was clearly erroneous.

The Trustee has failed to prove that the legal services after July 2002 were not reasonably equivalent to TMC's payments, *i.e.*, not for fair consideration, *see supra* pp. 17-19. The evidence is voluminous and, at best, conflicting. As discussed above, *see supra* pp. 17-18, "good faith" is not a consideration in determining whether a conveyance is constructively fraudulent. Under Georgia's current law, "good faith" factors into only the liability amount of the transferee should the conveyance be found fraudulent. Thus, any evidence concerning DeLong's alleged knowledge after July 2002 of Rudolph Terry's and TMC's conflicting defenses that supports a scienter argument is not directly relevant.

The evidence clearly does not weigh in favor of finding that DeLong failed to provide fair consideration. By July 1, 2002, TMC was facing several serious counts which were stated in terms of the collective behavior on the part of Defendants. The record demonstrates substantive and voluminous work performed on behalf of TMC after 2002 in an effort to protect it from liability. Those efforts are evidenced in the billing records (*see* Pl. Trial Ex. # 13), in the partial summary judgment (Def. Trial Ex. # 15), in the pleading in which TMC argued that Rudolph Terry's actions were unauthorized and not in furtherance of TMC's

Case 04-03135    Doc 238    Filed 09/30/08    Entered 09/30/08 15:36:29    Desc Main
Document    Page 29 of 33

business based on an affidavit submitted by Roy Terry (Def. Trial Ex. # 27), and the amicus brief filed in the interlocutory appeal of a trial court's order compelling TMC's accountant's testimony (Pl. Ex. # 129). This work was beneficial to TMC if the baseline assumption is that TMC in some way could be on the hook for Rudolph Terry's actions. The Bankruptcy Court points to Roy Terry's affidavit as evidence that TMC and Rudolph Terry's defenses were necessarily inconsistent, 2007 WL 1560087, at *8, but the affidavit was dated in June 2003 (Defs. Trial Ex. # 27). The Court seems to discount the possibility that Roy Terry's position on TMC's knowledge or ratification was not clear, discoverable, or admitted to DeLong until later in the case.

In fact, the entire discussion regarding DeLong's strategy in representing TMC loses sight of a principle at the root of this court's determination. For various and well-honed policy reasons, courts have refused in other areas of law to microscopically dissect the strategic professional decisions made by attorneys in their representation. Part of the court's reluctance to recreate hypothetical routes TMC's representation could have taken is influenced by this chief concern: that courts should afford attorneys a certain degree of deference when it comes to their representation of clients. Attorneys representing a company like TMC, a closely-held corporation facing tremendous liability and, as it later turned out, criminal liability for its officers' conduct, not to mention bankruptcy, need as much flexibility and discretion as attorneys in other cases. Though allowing professional discretion in the context of ineffective assistance of counsel claims, for example, is in part distinguishable as

30

based on a primary concern for the accuracy of the adversarial process, *see White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992), the underlying principle runs beyond that concern. When courts play Monday morning quarterback with respect to litigation strategy, they are risking not only reaching the wrong outcome but also affecting the behavior of lawyers anticipating that review. The subsequent chilling effect on future representation is undesirable. "We [the courts] are not interested in grading lawyers' performances," *id.*, and the courts "should always avoid second guessing with the benefit of hindsight," *id.* at 1220, and instead "allow lawyers broad discretion to represent their clients by pursuing their own strategy," *id.* at 1221.

The insulation afforded lawyers reverberates in the area of malpractice claims as well. "[T]he tactical decisions made during the course of litigation require, by their nature, that the attorney be given a great deal of discretion." *Hudson v. Windholz*, 416 S.E.2d 120, 124 (Ga. Ct. App. 1992) (explaining the doctrine of "judgmental immunity," which Georgia and other jurisdictions have adopted). One of the policy justifications for protecting lawyer's strategic decisions from malpractice liability is because "[o]therwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight," *Paul v. Smith, Gambrell & Russell*, 599 S.E.2d 206, 208 (Ga. Ct. App. 2004).

Even more fundamentally, "[t]he honest exercise of professional judgment is dependent upon the reasonable exercise of discretion free from outside influence." *Paul*, 599

31

S.E.2d at 209. The court recognizes that legal malpractice review involves a lower threshold for evaluating an attorney's decisions – that of satisfying minimum duties – than ascertaining whether legal services are sufficiently valuable for fraudulent conveyance purposes. But particularly in the determination of constructive fraud – where the assessment depends not on fraudulent intent but on the objective evaluation of value to the debtor – an evaluation of value should focus on whether the fees match up to the amount of work accomplished, and not on how the representation could have been conducted differently, as was the Bankruptcy Court's focus, *see, e.g.*, 2007 WL 1560087, at *8 ("The proper comparison is not DeLong's services with no services, but rather the services rendered by DeLong with those of an attorney not encumbered with the defense of Rudolph Terry.").

It is not an exoneration of the Terry brothers to conclude that the Bankruptcy Court abused its discretion in finding that DeLong's legal services were of insufficient value and that TMC's payments to DeLong were constructively fraudulent. Nor is the court expressing approval of Delong's representation outside of this context. The court recognizes that the Bankruptcy Court's assessment of the circumstances surrounding the Commercial Factors litigation should be deferentially credited not only because of the standard of review, but also because of the unique circumstances of the Terry proceedings. As the Bankruptcy Court rightly pointed out in another of the many related proceedings arising out of the July 2003 bankruptcy of TMC,

> [t]he Terry Manufacturing bankruptcy proceedings have been of unusual complexity. The Court has struggled with the bankruptcy case and dozens of

32

> adversary proceedings . . . spun off in all directions for more than three years.
> If one thing can be said with any certainty at all, it is that nothing in this case
> is as it [at] first glance seems.

*In re Terry Mfg. Co.*, 345 B.R. 377, 381-82 (Bankr. M.D. Ala. 2006).  Not uncommon in the bankruptcy proceedings were creditors victimized by the criminal activities of the Terry brothers, creditors who "screamed long and loud about fraud perpetrated by Roy and Rudolph Terry, check kiting, destruction of records, and the rest of a now familiar litany of depredations."  *Id.* at 382.  Certainly the record in the case *sub judice* is replete with proof of perfidy on the part of the Terry brothers in their dealings with creditors.  The difficulty is separating, if indeed they should be separated, the actions and motives of the Terry brothers from those of other players in the drama, in particular, their attorneys in certain pre-bankruptcy civil litigation in Georgia.  That is this case.  Despite so massive an underlying fraudulent scheme, DeLong must be separated from that scheme.  TMC's payments to DeLong for his legal services were not fraudulent under Georgia law.

## VI. CONCLUSION

For the foregoing reasons, it is ORDERED that the Bankruptcy Court's May 29, 2007 Judgment is VACATED, and the case is REMANDED.  The Bankruptcy Court is INSTRUCTED to enter Judgment in favor of Defendants.

DONE this 30th day of September, 2008.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

33